proceedings. They shall remain so joined in the limited new trial for damages.

## VII.

■ Although we remand for a new trial, we nevertheless meet the evidentiary question raised by Appellants. In exercise of its discretion, the district court determined that the consumer declarations and complaints satisfied each of the elements of the rule governing the residual exception to hearsay Rule 807, Federal Rules of Evidence. The declarations and complaints had circumstantial guarantees of trustworthiness as all were made under oath subject to penalty of perjury, *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 576 (7th Cir.1989). Additionally, the declarations were being offered as evidence of Appellants' violation of the Permanent Injunction and the court found that "reasonable efforts" could not have produced more probative evidence under the circumstances of the hearing and their admission provided the court with greater opportunity to ascertain the truth and eliminate expense and delay. *FTC v. Kuykendall*, Case No. CIV–96–388–M, 4 (D.C.Okla. March 1, 2002) (Order), *reprinted in* App. at 554. The Appellants were also given notice of the consumer declarations approximately one month before the evidentiary hearing and had the opportunity to subpoena the individual consumers if they so desired. We are satisfied that the district court did not exceed its permissible discretionary authority.

■ Declarations of FTC employees were also properly admitted pursuant to Rule 1006, Federal Rules of Evidence, that provides, in pertinent part, that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." The declarations were properly ac-cepted as summaries of evidence obtained from Appellants' business records. We conclude that in this respect also, the district court did not exceed its appropriate discretionary authority.

\* \* \* \* \* \*

We have considered all contentions raised by the parties and conclude that no further discussion is necessary.

We **AFFIRM** the judgment of the district court except its determination of the amount of monetary sanctions to redress consumer injuries. We **REMAND** the proceedings for a limited new trial in accordance with the procedures hereinbefore set forth.

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marlin Anthony CLARKE, a.k.a. Brandon Knowles, a.k.a. Brent Smith, et al., Defendant–Appellant.**

No. 02–13405
Non–Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

Nov. 22, 2002.

Chet Kaufman, Randolph P. Murrell and William Rourk Clark, Jr., Fed. Pub. Defenders, Tallahassee, FL, for Defendant–Appellant.

Terry Flynn, Bruce Lowe, Tallahassee, FL, Pamela A. Moine, Asst. U.S. Atty., Pensacola, FL, for Plaintiff–Appellee.

Before DUBINA, HULL and MARCUS, Circuit Judges.

PER CURIAM:

 Following his guilty plea, Marlin Anthony Clarke was convicted of one count of illegally reentering the United States after being deported, in violation of 8 U.S.C. § 1326(a) and (b)(2). Clarke appeals the district court's denial of his motion to dismiss his indictment, arguing that he was untimely prosecuted in violation of the five-year limitations period in 18 U.S.C. § 3282. After review, we conclude that Clarke was "found in" the United States, within the meaning of 8 U.S.C. § 1326(a)(2), when the Immigration and Naturalization Service ("INS") officials, rather than state officials, discovered his presence in Florida in July 1999, and thus we affirm his conviction.[1]

## I. BACKGROUND FACTS

Clarke, a Bahamian national, first entered the United States in 1985. On November 8, 1989, he was convicted of felony robbery in Dade County, Florida. Clarke subsequently was deported on August 9, 1990. Sometime prior to July 12, 1994, Clarke reentered the United States. Beginning on July 12, 1994, Clarke was arrested numerous times by Florida law enforcement authorities. At each arrest, Clarke provided authorities with assumed names and claimed to be born in Miami, Florida. It is undisputed that the INS was not notified of these arrests.

The second to last of these arrests, on July 3, 1996, was for burglary of an occupied dwelling and for obstruction by disguise. Although Clarke again gave the arresting officer an alias, North Miami police were able to determine that he was Marlin Clarke through fingerprint comparison. The last arrest, on September 2, 1997, was for failing to appear on the July 3, 1996 charges. Clarke was ultimately sentenced to a six-year term of imprisonment in a Florida corrections facility.

On July 9, 1999, the INS learned that Clarke was serving a sentence in Madison Correctional Institution ("MCI") in Madison, Florida. On July 26, 1999, INS special agent Chris Note interviewed Clarke at MCI, and Clarke admitted that he was Marlin Anthony Clarke. The INS compared Clarke's fingerprints on file with the INS with his fingerprints from the Florida convictions and established that Clarke was the same man who had been deported in 1990.

On October 3, 2001, Clarke was indicted and charged with unlawfully being in the United States on July 9, 1999, following deportation on August 9, 1990. Clarke moved to dismiss the indictment as time-

---

1. We review a district court's denial of a motion to dismiss the indictment for an abuse of discretion. *United States v. Pielago,* 135 F.3d 703, 707 (11th Cir.1998). We review the district court's interpretation and application of statutes of limitations *de novo. United States v. Hunerlach,* 197 F.3d 1059, 1064 (11th Cir.1999).

barred, arguing that he was not being prosecuted for illegal reentry within five years after he was "found in" the United States. The district court denied the motion, finding that the five-year statute of limitations did not begin to run until July 9, 1999, when the INS discovered Clarke's presence in Florida. Clarke ultimately pled guilty to the charge, but reserved his right to appeal the denial of his motion to dismiss based on statute-of-limitations grounds.

## II. DISCUSSION

On appeal, Clarke argues that his indictment should have been dismissed as time-barred. He contends that he was "found in" the United States for statute of limitations purposes when Florida state authorities positively identified him as Marlin Anthony Clarke through fingerprint comparison on July 30, 1996. He claims that the INS's failure to discover his presence in a Florida prison can be attributed to a lack of diligence. Hence, his prosecution was outside the applicable five-year limitations period, which expired on July 30, 2001, more than two months before Clarke was indicted.

Under 8 U.S.C. § 1326, any alien who has been deported and thereafter "enters, attempts to enter, or is at any time *found in*" the United States, shall be fined or imprisoned. 8 U.S.C. § 1326(a)(1) and (2) (emphasis supplied). Thus, "[t]he statute contains three separate and distinct offenses, set forth disjunctively: entering, attempting to enter, or being found in the United States." *United States v. Castrillon–Gonzalez,* 77 F.3d 403, 405 (11th Cir. 1996).[2]

The statute of limitations applicable to § 1326 is found in 18 U.S.C. § 3282, and provides that "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3238. "The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie v. United States,* 397 U.S. 112, 114, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). The statute of limitations in criminal cases begins to run when the crime is "complete." *Id.* at 115, 90 S.Ct. 858. In Clarke's case, for the commission of the crime to be complete, he had to be "found in" the United States. *See United States v. Mercedes,* 287 F.3d 47, 54 (2d Cir.2002).

To be "found in" the United States within the meaning of § 1326, the alien must "have entered surreptitiously, bypassing a recognized immigration port of entry. The phrase 'found in' is synonymous with 'discovered in.'" *United States v. Canals–Jimenez,* 943 F.2d 1284, 1287 (11th Cir.1991). Several of our sister circuits have elaborated that for a defendant to be "found," the government must either know or, with the "exercise of diligence typical of law enforcement authorities," could have discovered the illegality of the defendant's presence. *See, e.g., United States v. Herrera–Ordones,* 190 F.3d 504, 510–11 (7th Cir.1999); *United States v. Bencomo Castillo,* 176 F.3d 1300, 1303 (10th Cir.1999); *United States v. Santana–Castellano,* 74 F.3d 593, 598 (5th Cir.1996); *United States v. Moses,* 148 F.3d 277, 282

---

**2.** If, as here, the alien's removal was subsequent to a conviction for commission of an aggravated felony, "such alien shall be fined under such Title, imprisoned not more than 20 years, or both[.]" 8 U.S.C. § 1326(b)(2).

(2d Cir.1995). As Clarke correctly points out, § 1326 is silent as to *who* must find the defendant.

### A. Imputed Knowledge

■ Clarke argues that the INS, using diligence typical of law enforcement authorities, could have learned of his illegal presence in the United States on July 30, 1996, when Florida police officials confirmed his true identity through fingerprint analysis. To the extent that Clarke contends that the knowledge of Florida police can be imputed to the INS and therefore is sufficient to start the running of the five-year statute of limitations, we reject this argument. Clarke provided no authority for the proposition that a defendant is "found in" the United States when he is discovered by state authorities, and our own research revealed none.

The Second Circuit, on the other hand, has expressly rejected such an argument. In *United States v. Mercedes*, 287 F.3d 47 (2d Cir.2002), the defendant Mercedes was arrested by New York City police officers and convicted on a state charge of manslaughter. *Id.* at 50. Three years later, INS officials learned of the defendant's presence in a New York prison, where he was awaiting sentencing. *Id.* After reviewing INS files and determining that the defendant illegally had reentered the country after being deported, the Government charged the defendant under § 1326. *Id.* The Second Circuit rejected the notion that the statute of limitations began to run shortly after New York law enforcement officials arrested Mercedes, took his fingerprints, and generated a "rap" sheet, as follows:

> [I]f any authority was on notice of Mercedes's illegal presence in the United States in 1993, it was the New York State Department of Corrections, not the INS. Mercedes essentially asks us to adopt a rule that would make the INS responsible for any immigration-related information discovered in *state* investigations of the hundreds of thousands of prisoners in state custody at any given time.

*Id.* at 55.

In addition, this construction of "found in" is consistent with this Court's decision in *United States v. Coeur*, 196 F.3d 1344 (11th Cir.1999), although involving the application of an amended Sentencing Guidelines provision rather than the statute of limitations. In *Coeur*, this Court agreed with the Fifth Circuit decision in *United States v. Santana–Castellano*, 74 F.3d 593 (5th Cir.1996), that a defendant is "found in" the United States when "his physical presence is discovered and noted by the immigration authorities" and concluded, for purposes of calculating criminal history points under U.S.S.G. § 4A1.1, that the defendant "committed" his § 1326 offense when he was discovered by INS officials at the Dade County jail. 196 F.3d at 1346 (11th Cir.1999).

Furthermore, a number of the decisions defining § 1326's phrase "found in," including our decision in *Coeur*, arose in circumstances where the defendant was initially detained by state authorities and only later discovered by the INS while in state custody. In all of these decisions, it was the date that the INS, not the state officials, discovered or could have discovered the defendant's illegal presence that mattered to the court's analysis. *See United States v. Acevedo*, 229 F.3d 350 (2d Cir.2000) (rejecting defendant's claim for ineffective assistance of counsel for failing to raise statute-of-limitations defense because statute of limitations did not begin to run until defendant was "found in" the United States by INS and, thus, defendant's prosecution was timely); *United States v. Herrera–Ordones*, 190 F.3d 504

(7th Cir.1999) (citing other circuits and agreeing that, for purposes of venue, defendant is "found in" the United States when INS both discovers defendant's presence and knows his identity and illegal status); *United States v. Hernandez,* 189 F.3d 785 (9th Cir.1999) (relying on cases from other circuits, which conclude that defendant is "found in" the United States for purposes of statute of limitations when immigration officials discover him, to hold that a defendant is "found in" the United States for purposes of venue where the immigration officials discover him); *United States v. Bencomo–Castillo,* 176 F.3d 1300 (10th Cir.1999) (adopting approach of other circuits that a defendant is "found in" the United States when INS through reasonable diligence should have discovered defendant and determining that amended version of Sentencing Guidelines was in effect when defendant was so "found").[3]

Accordingly, we conclude that the phrase "found in" contained in § 1326 refers to the actions of federal immigration officials, not those of state law enforcement officials. In other words, the defendant must be "found in" the United States by federal immigration officials for the § 1326 crime to be complete and for the

statute of limitations in 18 U.S.C. § 3282 to begin to run.

**B. Constructive Knowledge**

■ We also reject Clarke's contention that the INS in this case could have discovered his illegal presence before October 3, 1996, through the exercise of diligence typical of law enforcement authorities. Clarke claims that, although Florida law enforcement officials positively identified Clarke on July 30, 1996, the INS "failed to connect his identity to its records until July 9, 1999." Therefore, Clarke argues, the INS had constructive knowledge as of July 30, 1996.

Nothing in this record suggests that INS official could have discovered Clarke any sooner than they did. It is undisputed that Florida law enforcement officials did not notify the INS of Clarke's presence in the state. *See Acevedo,* 229 F.3d at 356 (holding that statute of limitations began to run when state department of correctional services sent first letter notifying INS of defendant's incarceration). There is no indication that the INS had some sort of pre-trial immigration status screening procedure in place in Florida that should have discovered Clarke's presence when he was arrested by Florida law enforcement officials in 1996 or 1997.[4]

---

**3.** We recognize that many of these cases do not involve a statute of limitations issue, but rather involve various other issues, such as proper venue or the application of an amended Sentencing Guidelines provision. Nonetheless, we find these courts' consistent interpretation and application of the "found in" language of § 1326(a)(2) persuasive.

**4.** On this basis, the two cases cited by Clarke in his brief are distinguishable on their facts. In *United States v. Gomez,* 38 F.3d 1031 (8th Cir.1994) and *United States v. DiSantillo,* 615 F.2d 128 (3d Cir.1980), the courts concluded that immigration authorities had information that, through the exercise of diligence typical of law enforcement authorities, could have led to the discovery of the defendant's illegal

presence. *See United States v. Gomez,* 38 F.3d 1031, 1038 (8th Cir.1994) (finding that defendant was constructively "found in" the United States when defendant provided fingerprints to INS on falsified INS form); *United States v. DiSantillo* (finding that defendant was found and § 1326 offense completed when defendant entered United States through recognized immigration port of entry in New York after being issued visa because immigration authorities knew of his entry and "could have, through the exercise of diligence typical of law enforcement authorities, discovered his violations at that time"). In contrast, *Clarke surreptitiously reentered the United States, so that immigration officials were not aware of his reentry.*

In sum, we conclude that Clarke was "found in" the United States, within the meaning of 8 U.S.C. § 1326(a)(2), when INS officials, rather than state officials, discovered his presence in Florida in July 1999. Accordingly, the Government's October 3, 2001, indictment was not barred by the five-year limitations period in 18 U.S.C. § 3282, and the district court properly denied Clarke's motion to dismiss his indictment.

AFFIRMED.